## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

TOYA STEED                         )

                                        )

        Plaintiff,                )

                                        )

v.                                   )    Case No. 4:17- CV-01440 HEA

                                        )

MISSOURI STATE HWY PATROL, et. al,    )

                                        )

        Defendants.

## AFFIDAVIT OF PRESIADA HAYES

     I, Presiada Hayes, of lawful age, after being duly sworn upon his oath, deposes and states as follows:

     1.     My name is Presiada Hayes, and I have first-hand knowledge of the facts and information set-forth herein below.

     2.     I am currently employed by Verizon in the collection center located in Hazelwood, Missouri.

     3.     I reside at 8405 McLaran Avenue, Jennings, Missouri 63136.

     4.     On Sunday, May 11, 2014, I was involved in a horrific fatal crash on Interstate 55 at the Imperial Main Street exit located in Jefferson County, Missouri.

     5.     There was a total of four (4) occupants travelling in a Blue Ford Explore at the time of the crash.  I along with Leon Haywood; Lavoy Steed; and Jerome Goode were in the SUV.

     6.     Each of the occupants of the vehicle are African-American.

     7.     Upon information and belief, each of the officers involved in the high-speed pursuit that will be discussed herein below, are Caucasian.

     8.     Jeromy Goode was operating the vehicle at the time of the crash.

1

9.      Leon Hawood was sitting in the front passenger seat of the car.

10.     I was sitting in the back seat of the vehicle, immediately behind the driver.

11.     Lavoy was sitting in the right rear passenger seat.

12.     We were on our way back home from Southeast Missouri State University.

13.     Goode put gas in the SUV in Cape Girardeau, Missouri before entering Interstate 55.  We didn't stop again until we were pulled over by the Missouri State Highway Patrol.

14.     I believed that the vehicle I was riding in was travelling at or near the speed limit at the time we were stopped because we were travelling at the same speed as every other car on the road.

15.     Goode slowed down and pulled the vehicle over to the shoulder of the road and came to a complete stop.

16.     The officer approached the vehicle and got close enough to it to see the occupants. Jerome Goode drove off before the officer reached the back of the SUV.  I immediately became fearful, as I had no idea why Goode drove away.  The officer immediately started pursuing the vehicle.

17.     I couldn't believe what was happening.  We asked Goode what he was doing, but he didn't respond.  Each person in the car asked him to stop, or pull over, but he wouldn't listen.

18.     I kept looking back through the rear window of the vehicle fearful of what might happen if or when Goode came to his senses and stopped the car. I kept thinking about the numerous instances where African American motorists and others were beaten, shot and/or killed by the police. This prompted me to tell the driver to "pull over, "stop the car", "I want to get out".

19.     It seemed like every time I turned around to look out the rear window, another law enforcement officer had joined the chase. In fact, there were so many police cars following us that

2

it looked like a large, high-speed funeral procession. As it turned out, that's exactly what it became – a rolling funeral procession where the law enforcement was ushering innocent bystanders to their death.

20.      There were several law enforcement officers following immediately behind us. At times, there were law enforcement officers to the left and to the right of the vehicle.  It felt like the scariest ride at an amusement park, the difference being, I did not choose to be on this deadly ride, that became increasingly dangerous as time went on.

21.      The pursuit became more and more dangerous due, in part to the ever-increasing number of law enforcement officers joining the pursuit.  Goode's driving became increasingly erratic as more officers were involved in the pursuit.

22.      The Missouri State Highway Patrol attempted to stop the vehicle on more than one occasion. They deployed spike strips across the interstate in an apparent effort to cause us to crash.

23.      I do not purport to be a crash scene expert, but it doesn't take a seasoned professional to know that deploying spike strips will likely cause a car, traveling at a high rate of speed to crash either by avoiding the spikes or by running over it.

24.      Yet, J.A. Ashby of the MSHP, deployed spike strips.

25.      The spike strips blended in with the road. It was extremely difficult to see them until we were close to hitting them. This might explain why it's so difficult to see the spike strips from the dash cam videos of the pursuit that I viewed.

26.      Yet, the Missouri State Highway Patrol attempted to stop the vehicle by deploying spike strips a second time.  Once again, the Missouri State Highway Patrol put me in the other aforementioned passengers of the vehicle in harm's way. In so doing, they unnecessarily put

numerous other motorists traveling on Interstate 55 at the time at risk of death or serious bodily injury.

27.     I simply do not understand why the Missouri State Highway Patrol and other police departments continued the pursuit.

28.     ;I am certain that the Missouri State Highway Patrol had the license plates number of the vehicle Goode was driving.  There is no place for him to run and there is no place for him to hide. Consequently, there was no reason to risk my life and the life of others in the car and on the highway simply for a speeding violation.

29.     Moreover, when Goode appeared to slow down when law enforcement backed off of the pursuit. Each time the officers got closer to the SUV, Goode drove faster and faster.

30.     Lavoy Steed became increasingly upset by the pursuit in the apparent decision by the Missouri State Highway Patrol to continue the chase placing innocent bystanders including the occupants of the vehicle at great risk of death and/or serious bodily injury. He was so distraught that he called his mother, Toya Steed using his cell phone.

31.     Lavoy told his mother, "Momma—this mutha fucka—got us in a high-speed chase with the State Troopers and he won't let us out the car…! Please help…please help…"

32.     Toya Steed called the Missouri State Highway Patrol in an effort to have them terminate the chase.

33.     Around this time, Lavoy yelled, "stop the damn car man!!!!! Please stop the car…let me the fuck out…Let me out…Stop running man, why the hell are you running from the police… man let me out!!!!!....

34.     Seconds before the crash, a Missouri State Highway Patrol vehicle pulled into the far left lane. We were driving in the lane next to it. The vehicle that was immediately behind us,

4

moved to the right lane. You vehicle in the far left lane, started drifting to the center lane where we were driving, forcing Goode to change lanes and ultimately forcing us to take the Imperial Main exit.

35.     I do not recall much after taking the exit, as there was a horrific crash after taking the exit.

36.     However, I recall waking up inside of hospital, surrounded by my mother and other family members. Sometime afterwards, a plain clothes detective entered my room. He began asking me about a robbery and if I knew anything about it. I had no idea what he was talking about. My mother became visibly upset at this line of questioning and instructed the officer to leave my room. I never heard from him or anyone else from the Missouri State Highway Patrol.

37.     I sustained significant injuries as a result of the crash. It is my understanding that I still have medical bills in excess of forty thousand dollars.

38.     I did not learn of this or the potential to pursue a claim against either the city of Pevely and/or the Missouri State Highway Patrol, or officers working for either of the two entities until recently.

39.     In fact, the first year after the accident was spent convalescing. I had a head injury, which affected by cognitive abilities, including by short-term memory. I had injuries to my face and lip, as well as to my left knee.

40.     It took me the better part of two years, before I realized what had really happened.

41.     My mother assisted me in seeking legal help sometime between two thousand sixteen in two thousand seventeen. Again, I was not in a position to make any decisions on my own, in light of my medical condition, and my temporary loss of memory. Consequently, I relied

almost exclusively on my mother to find a lawyer and to see what, if anything could be done to obtain compensation for my losses.

42.     Sometime on or about July 5, 2017, I received a small settlement for injuries sustained as a result of the aforementioned crash. My total medical bills were in excess of $47,133.20. Those fields remain largely unpaid. The total settlement proceeds that I received was somewhere around $14,171.44.

43.     I am not sure whether my attorney, Kurt Wolfgram knew, or was aware of the potential claims that I had against both the city of Pevely and/or the Missouri State Highway Patrol. Regardless, upon information and belief, he did not pursue such claims on my behalf.

44.     Recently, I was approached by Toya Steed. She asked if I had any first-hand information regarding the last minutes of her son's life.

45.     I was friends with Lavoy Steed and I wanted to do anything that I could to share his final memories with his mother.

46.     As a result, we met, and I agreed to meet with her attorney.

47.     My memory was still somewhat foggy, because of the injuries I sustained as a result of the accident.

48.     I was presented with a video dash cam of the pursuit from Ptn. Litterall, Benjamin DSN 782. I watched it from the very beginning, until the end, when our car crashed. The video consisted of 32:41 minutes.

49.     I counted more than a hundred and forty cars that we passed on the highway during the pursuit. There were countless other cars on exits, being held back by various law enforcement agencies. Traffic was heavy at times, meaning that there were cars in each lane both in front of us

and on the sides of us as we drove down Interstate 55 N. This did not deter the Missouri State Highway Patrol from continuing their pursuit.

50.     The video helps refresh my recollection as to the events that occurred before the crash. Unfortunately, the remains portions of my memory that are forever lost.

51.     Regardless, I, along with Leon Haywood and Lavoy Steed were all innocent bystanders.  We were truly guiltless witnesses of a misdemeanor traffic violations that culminated in a high-speed chase.  None of us wanted to be in that vehicle with Mr. Goode after he drove away from the initial stop by the Missouri State Highway Patrol.

52.     Mr. Goode was the only person that violated the law. Even so, he had not had his day in court to prove his guilt or innocence of a crime.

53.     Nevertheless, I, or the others unequivocally had not committed a crime. We had not violated the law at all. I was not driving the car. I did not decide to evade the police. Nor did I put other motorists at risk by driving recklessly along the interstate. Law enforcement had absolutely no reason to place my life, or the life of Leon Haywood and/or Lavoy Steed in jeopardy, as we had done nothing to deserve such a fate. We were truly innocent bystanders.

54.     It became apparent that Goode would not stop the vehicle, as long as the State Highway Patrol and other law enforcement agencies continued the pursuit. We are driving far too fast to simply jump out of the car. Goode was not listening to our pleas to stop the car. This undoubtedly influenced Lavoy's decision to call his mother.

55.     I firmly believe that race was a factor in the decision to initiate and maintain a high-speed pursuit on a crowded interstate highway. It influenced the Missouri State Highway Patrol's decision to deploy spike strips on a busy interstate as well. To be clear, I do not believe for one

7

moment that the Missouri State Highway Patrol would have deployed spike strips if and as the occupants of the vehicle were Caucasian.

56.     The initial police stop was suspect, as I do not believe we were speeding.

57.     Officers from the Missouri State Highway Patrol continued to point long rifles and guns at occupants of the vehicle after the crash.  These individuals were ejected from the vehicle, several feet into the air.  Their bodies were mangled as part of the crash and/or once their bodies impacted with the ground. Consequently, anyone could see that they posed no risk of harm to the officers. The officers actions with respect to the chase and the subsequent crash demonstrates to me a dual policy. One that recognizes and appreciates exercising discretion when it comes to Caucasians. However, it comes to African-Americans and other minorities, there is a complete lack of empathy, concern, and desire to preserve life.

**FURTHER, AFFIANT SAYETH NOT.**

Presiada Hayes

Subscribed and sworn before me this __5__ day of __September__ 2019.

Commission Expires: __8-9-21__

AFFIX SEAL BELOW

NOTARY PUBLIC



8